## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 22-cv-242

**NICOLAS ORLIN;**
**SHAWN MURPHY**

       Plaintiffs,

v.

**THE CITY AND COUNTY OF DENVER, a Colorado municipal corporation;**
**DOES 1-5, in their individual capacities and whose names are unknown,**

       Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs, Nicholas Orlin and Shawn Murphy, by and through their counsel of record, BAUMGARTNER LAW, LLC, and BEEM & ISLEY, P.C., respectfully submit this Complaint against the Defendants, and allege and aver as follows:

### JURISDICTION AND VENUE

1.    This action is brought pursuant to 42 U.S.C. §1983 and §1988, and the First, Fourth, and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §1331, §1343(a)(3) and (4), and the aforementioned statutory and constitutional provisions.

2.    Venue is proper in the United States District Court for the District of Colorado pursuant to 28 USC §1391(b) because the Defendants are citizens and residents of Colorado, and the events, acts and/or omissions giving rise to this action occurred in Colorado.

## PARTIES

3.     Plaintiff Nicolas Orlin ("Plaintiff Orlin") is and was at all relevant times a citizen of the State of Colorado, residing and domiciled in Aurora, Colorado.

4.     Plaintiff Shawn Murphy ("Plaintiff Murphy") is and was at all relevant times a citizen of the State of Colorado, residing and domiciled in Denver, Colorado.

5.     Defendant The City and County of Denver (the "City") is and was at all relevant times a Colorado home-rule municipality with final policy-making authority over the Denver Police Department ("DPD") and its police officers.

6.     At all relevant times, the City was responsible for supervising, enacting, and enforcing the DPD's conduct, policies, and practices; the absence of necessary policies and practices; and for the hiring, retention, supervision, and training of employees and agents of the DPD. The City was also responsible for the actions of officers from other law enforcement agencies from whom the City requested assistance.

7.     Defendants Does 1 through 5 are and were at all relevant times officers, employees, and/or agents of the DPD or officers of other agencies or jurisdictions who were acting under color of state law and within the course and scope of their agency or employment with and/or the authorization of the DPD, and who violated the clearly established constitutional rights of Plaintiffs as alleged more fully below. Plaintiffs do not currently know the true names and capacities of the Defendants sued herein as Does 1 through 5, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. The individual Doe Defendants are sued in their individual capacities and are hereinafter referred to as the "Defendant Officers."

8.      Upon information and belief, the Defendant Officers are citizens of the State of Colorado.

9.      All Defendants are responsible in some manner for the damages and injuries alleged in this Complaint.

10.     At all relevant times, the acts and omissions of the Defendant Officers were pursuant to the customs, policies, practices, procedures, supervision, and training of the City and the DPD.

## GENERAL ALLEGATIONS AND FACTUAL BACKGROUND

### A.      Background Facts Central to Plaintiffs' Claims and Injuries

11.     On May 25, 2020, Minneapolis police murdered George Floyd, igniting protests around the country against police violence.

12.     Beginning on May 28, 2020, protesters from diverse backgrounds began to assemble in the downtown Denver area, specifically around the Capitol Building and the surrounding government buildings – the most traditional of forums for protests against governmental abuse of power.

13.     The overwhelming majority of these protesters were assembled to exercise their First Amendment right to peacefully express their views. Among them were the Plaintiffs, Nicholas Orlin and Sean Murphy.

14.     On or about May 30, 2020, Plaintiffs, who did not know each other, were separately attending a peaceful protest against police brutality at or near the State Capitol Building in Denver, Colorado, in response to officer-involved killings nationwide.

15.     At approximately 6:30 p.m., both Plaintiffs happened to be in or near Lincoln Park

and the intersection of Lincoln and Colfax Avenue in Denver.

16.     Denver police officers outfitted in riot gear and weapons were also present in the vicinity.

17.     Plaintiff Orlin had been filming the protest and the police officers throughout the day. While Plaintiff Orlin stood on the lawn of Lincoln Park, nearby police officers threw a tear gas canister at the group of peaceful protesters near him.

18.     Plaintiff Orlin ran to place a traffic cone over the tear gas canister in an effort to reduce the amount of noxious gas being released in the area. As he did this, and while posing no threat to anyone, he was struck suddenly and without any commands or warning in his left eye with a rubber bullet or similar hard projectile fired by one of the Defendant Officers.

19.     The physical force and trauma of the projectile not only knocked Plaintiff Orlin to the ground and rendered him unconscious, but it also severely injured his eye and surrounding face and caused excruciating pain.

20.     Another protester, who was approaching the same tear gas canister at the same time as Mr. Orlin, was also shot in the upper torso with a rubber bullet or similar hard projectile.

21.     It is clear from video taken of the incident that the Defendant Officers who shot the two men were retaliating against them for attempting to suppress the noxious gas, and not because they were threatening anyone or otherwise engaged in any illegal activity.

22.     Plaintiff Orlin was transported to a local hospital emergency room where he underwent several procedures to address the injuries to his left eye and face.

23.     Despite these efforts, Plaintiff Orlin has lost about half of his vision (i.e., is partially blinded) in his left eye as a direct result of being shot in the eye, and he sustained a permanent

disfiguring injury to the left side of his face.

24.     While in the hospital, Plaintiff Orlin's injuries were documented in a photograph:



25.     Plaintiff Murphy, who happened to be standing alone and apart from any group, but in the same general vicinity as Plaintiff Orlin at approximately the same time, was also shot suddenly and without warning in his left eye by a rubber bullet or similar hard projectile fired by one of the Defendant Officers.

26.     Plaintiff Murphy is well over six feet tall, was in close proximity to the Defendant Officers who shot him, and was separated by many feet from other protesters.

27.     Plaintiff Murphy experienced immediate, excruciating pain, was shocked, stunned, terrified, and rendered immobile as blood drained and flesh hung from his left eye and face,

resulting in immediate blindness in his left eye.

28.     Nearby citizens helped Plaintiff Murphy get to St. Joseph Hospital where doctors determined that he suffered a macular tear to the retina of his left eye, which required surgery to repair. Plaintiff Murphy suffered loss of vision for several months, and although his left eye and vision were saved, the vision in his left eye is diminished, and he has prominent and permanent facial scarring from the trauma and related surgery.

29.     Plaintiff Murphy's injuries were also documented in a photograph:



30.     Neither Plaintiff was armed with any weapon at the time they were shot in their eyes by the Defendant Officers.

31.     Neither Plaintiff was rioting or otherwise engaged in any violent, threatening, or

dangerous behavior at the time they were shot.

32.     Neither Plaintiff could be reasonably perceived as a threat of any kind at any time they were attending the protests.

33.     At the time the Plaintiffs were shot in their heads, faces, and eyes by the Defendant Officers, the DPD and its officers and agents were using various types of weapons often known as "less-lethal" weapons, including without limitation hard rubber bullets, kinetic impact projectiles ("KIPs"), and pepper balls that can be loaded into a gun or launcher and aimed and fired with precision at an intended target.

34.     One or more of the Defendant Officers purposefully aimed and fired their weapons, loaded with one of these hard projectiles directly at the Plaintiffs' respective heads, faces, and eyes.

**B.      Factual Allegations Relating to The City of Denver's Customs, Policies, Practices, Procedures, Supervision, and Training**

35.     The City, through the Mayor, the Chief of Police, and/or the Manager of Safety/Executive Director of Safety, had the ultimate decision- and policy-making power for the DPD and ultimate responsibility for training the DPD's police officers, including the Defendant Officers.

36.     The Defendant Officers violated Plaintiffs' constitutional rights as previously alleged.

37.     The protests against police brutality that were occurring at the time Plaintiffs were shot in their eyes with hard "less-lethal" projectiles started two days earlier, on or about May 28, 2020, and continued almost daily into the middle of June.

38.     In response to the protests and demonstrations, the City, through its law enforcement agency, the DPD, dispatched its officers and officers invited from other agencies and jurisdictions into the streets of the City.

39.     Among these other law enforcement agencies that the City invited to assist in responding to the protests was the Aurora Police Department ("Aurora PD"), which has recently entered into a consent decree to improve its policing following an internal use-of-force review and a review by the Colorado Attorney General's office that revealed systemic use of excessive force and an extensive lack of training in many areas of policing, specifically including the constitutional limits of use of force and de-escalation tactics, among other constitutional violations.

40.     The Defendant City, as a participant of many past certification review processes (Critical Incident Response Team or "CIRT") of the Aurora PD's use of force causing serious bodily injury or death, knew or should have known of these deficient policies, customs, and training before it invited Aurora PD officers to join and assist officers of the DPD in responding to the protests.

41.     Nevertheless, the City invited Aurora police officers to assist and authorized them to use force within Denver city limits without taking any steps whatsoever to ensure that Aurora officers would act within constitutional constraints with regard to protesters.  As such, the Aurora police officers were acting at the direction of the City, as agents of the City, and the City is responsible for their actions, just as if they were officers of the DPD.

42.     The police officers, including Denver officers, officers who were assisting from other jurisdictions, and the Defendant Officers (collectively referred to as "Denver police officers"), were outfitted in protective riot gear and were armed with "less-lethal" munitions,

including chemical sprays (tear gas and pepper spray) and hard potentially injurious projectiles, such as flashbang grenades, pepper balls, rubber bullets, and other kinetic impact projectiles ("KIPs"), that can be loaded into a gun or "launcher," aimed, and fired with precision at any target.

43.     From the very beginning of the protests, the City and its decision-makers, including the Mayor, the Chief of Police, and the Manager of Public Safety, had knowledge that the DPD had a custom of inflicting injury on protesters, and that the Aurora Police Department had a history of excessive force.

44.     For example, at or near the beginning of the protests, one Denver police officer posted a photograph on Instagram showing himself and two other officers dressed in riot gear with the caption, "Let's start a riot."

45.     According to media reports, this officer joined the DPD in October 2019 and would have completed the Department's 3.5-month-long field training program in January or February of 2020 – just months before being assigned to the protests.

46.     In addition to the overt attitudes of its officers, the City had independent knowledge of DPD customs. In the first days of the protests, the City was inundated with complaints of excessive force against peaceful protesters.

47.     Conventional and social media overflowed with stories, images, and videos of peaceful protesters who were injured due to police violence against them. Many of these instances involved people, who, like Plaintiffs, were injured by police with less lethal projectiles shot at their most sensitive body parts, including the face, head, and genitals.

48.     The following are among the many people targeted, shot, and injured by officers and agents of the DPD at or around the same date as Plaintiffs:

<u>May 28, 2020</u>

     a.  Michael Acker (shot in the face causing lacerations to the eye and face);

     b.  Emily Heydt (shot multiple times in her hand and groin with pepper balls from short range while she was stopped on her motorbike behind a Denver SWAT truck);

<u>May 29, 2020</u>

     c.  Megan Matthews (shot in the face causing loss of consciousness, multiple lacerations to the head, a broken nose, and broken facial bones);

     d.  Gabriel Thorn (shot in the head);

     e.  Cameraman (name unknown) for Denver Channel 7 (shot four times in the chest while holding a camera to his face and shattering the lens to the camera);

     f.  Christopher Holland (shot in the wrist while holding a protest sign above his head resulting in bone bruising);

     g.  Ellektra Rowland (shot in the head resulting in a contusion);

     h.  Andy Sannier (shot in the chest while filming);

     i.  Gregory Trickle (targeted with laser sights in the face and groin);

<u>May 30, 2020</u>

     j.  Michael McDaniel (shot in the head);

     k.  Elizabeth Eps (shot in the eye and face, causing facial and eye wounds);

     l.  Jax Feldmann (shot in the eye, causing permanent blindness and loss of his eye);

     m.  Alex Wolfson (shot directly in the eyeball causing a detached retina requiring surgery);

n.  Russel Strong (shot in the face causing the loss of his right eye);

o.  Dan Delany (shot in the back of the head while fleeing from officers rendering him unconscious and lacerating his scalp);

p.  Brianna Barber (repeatedly shot in the face and head, including the sign she was holding above her head);

q.  Scarlet Barnhill (shot in the face, hitting her eyeglasses);

r.  James Sweetman (shot with pepper balls in the head and back, causing contusions);

s.  Steven Fink (shot in the groin, causing a ruptured testicle);

May 31, 2020

t.  Gabe Schlough (shot in the face and chest while helping a woman shot with a tear gas canister, causing a massive wound to his face);

u.  Zachary Packard (shot in the face and head, causing a broken skull and jaw);

v.  Yousef Amghar (shot in the head and chest while holding his hands up and chanting "hands up, don't shoot");

w.  Alex Burness of *The Denver Post* (shot in the head and abdomen after he yelled, "Press!");

x.  Darian Tindall (shot in chest while her hands were raised above her head);

y.  Trevor Hughes (shot in the finger, breaking and severing it and requiring reconstructive surgery);

z.  Ambrose Cruz (shot three times in the eye area causing his eye to be swollen shut, lacerations, and severe bruising of the face);

June 2, 2020

        aa. Darrell Hampton (shot in the face while standing on a sidewalk filming).

46.     Each of the above examples involved the use of force by DPD officers and agents against peaceful protesters, observers, or members of the press, and none of the above people, including the two Plaintiffs, were given the required orders to disperse or otherwise given an opportunity to comply before being shot with less lethal weapons.

47.     Not a single officer has ever been disciplined for any of these serious attacks, demonstrating the City's approval of the officer's actions and the City's policy-in-fact of forceful suppression of peaceful protests.

48.     The violence against peaceful protesters was so widespread and harmful that it dominated all major media sources, including traditional and social media, and was the subject of numerous citizen complaints. As a result, the City, including the Mayor, the Chief of Police, and the Manager of Public Safety, knew about most, if not all, the above-alleged incidents.

49.     In fact, even in November of 2020, Denver police officers continued to act within this policy-in-fact of attacking non-threatening protesters. One example of this continued policy-in-fact occurred on November 4, 2020, the day after the presidential election, when Ariel Wolff was peacefully protesting on Colfax Avenue. When asked to leave by Denver police officers, he complied but was still shot in the back of the head with a hard pepper ball that left him with a contusion and chemical burns to his eyes, throat, and mouth. In keeping with the City's policy-in-fact of violent and disproportionate use of force to suppress protests, no officer was disciplined for this conduct. The City's policy remains the same to this day.

50.     There are many more examples of the City's actual policy of suppressing peaceful

protest, but the above cases are a representative sample of a policy that has been in place at least since the 2011 "Occupy" protests, addressed more fully below.

51.     The City's failure to supervise, discipline, train, or even reprimand officers for this consistent and now regular illegal use of force demonstrates that the City's leaders and decision-makers have accepted the customs that prevail within the DPD.

52.     The City's failure to constrain its officers in any way despite being aware of the many injuries its officers had caused and were causing during the protests is clear evidence of the City's utter and deliberate indifference to the customary use of excessive and disproportionate force toward protesters.

53.     In fact, on May 29, 2020, in the midst of ever-increasing reports of injuries to dozens of peaceful protesters, the City's decision-makers, including the Mayor and Chief of Police, publicly praised the DPD for its "tremendous restraint," stating that the Denver officers' use of less lethal weapons was proper.

54.     Such public praise by the City's decision-makers, not only ratified the officers' unconstitutional conduct, but also demonstrated the City's deliberate indifference to continuing violations of the constitutional rights of protesters by DPD officers.

55.     Once again, the City's decision-makers were acutely aware of the injuries to citizens from less lethal weapons, and expressly ratified the actions of the officers.

56.     Furthermore, four citizen plaintiffs filed an action against the City on June 4, 2020, *Abay v. City of Denver*, that was subsequently removed to the United States District Court for the District of Colorado, Civ. Action No. 20-cv-01616-RBJ, and included allegations that the City, through its DPD officers, used and condoned the use of excessive force tactics against peaceful

protestors, members of the media, and even third-parties in the vicinity of the protesters to punish them for demonstrating against police brutality and with the intention and/or effect of discouraging their and others' First Amendment right to free speech and expression.

57.     The *Abay* action resulted in the issuance of a temporary restraining order restricting the officers "from employing chemical weapons or projectiles of any kind against persons engaging in peaceful protests or demonstrations … unless an on-scene supervisor at the rank of Captain or above specifically authorizes such use of force in response to specific acts of violence or destruction of property that the command officer has personally witnessed." *Abay v. City of Denver*, 445 F.Supp.3d 1286, 1294 (D.Colo., June 5, 2020).

58.     Around the same time, the City's Executive Director of Safety, Murphy Robinson, sent a memorandum to Chief of Police, Paul Pazen, that referred to the recent protest activities and serious injuries caused by pepper balls and rubber-tipped rounds fired by 40-mm launchers. Mr. Robinson requested that the City immediately consider prohibiting the use of 40-mm launchers against any individuals in a crowd during any upcoming protests, that there be an internal review to determine whether such launchers are appropriate for crowd control, and that all DPD officers authorized to use pepper balls be reminded of their training, including that pepper balls may only be fired at the ground and not into a crowd of protesters. A copy of this memorandum is attached hereto and incorporated by reference herein as **Exhibit 1**.

59.     However, officers and agents of the DPD continued to indiscriminately use such weapons against protesters in defiance of the Court's Order, and the City continued to condone and ratify these actions through inaction for the duration of the protests, which continued through the summer.

60.     The allegations on which the restraining order in *Abay* was based are consistent with the attitude expressed in the now-terminated DPD officer's Instagram post and the findings of the OIM report that a policy, practice, and/or custom existed in the DPD that condoned or was callously indifferent to the use of unnecessary and excessive force by its officers against its own citizens.

61.     It simply cannot be said that the City was unaware of its officers' conduct while the protests were occurring.

62.     The Denver Office of the Independent Monitor ("OIM") also found many problems with the DPD's use of force in a detailed report concerning the DPD's response to the 2020 protests. The OIM report cited observations of DPD officers consistently using less-lethal munitions in troubling ways, specifically including the following:

a.   Failing to issue orders to disperse in the vast majority of instances before deploying less lethal munitions;

b.   Deploying pepper ball rounds at persons who were verbally objecting to police behavior and not engaged in apparent physical resistance;

c.   Deploying pepper ball rounds and other projectiles that nearly or directly impacted prohibited areas of the body, including the head, face, and groin;

d.   Continuing to deploy chemical, gas, impact, or explosive munitions after their use had already caused people to disperse and leave an area; and

e.   Failing without good cause to turn on body cameras in the overwhelming majority of incidents in which the officers deployed less lethal weapons.

63.     The OIM report found that not all officers using projectile launchers, including

pepper ball and 40-mm launchers, were trained and certified in using such weapons, and it recommended that the DPD implement standards to specify and ensure that only authorized officers may use such weapons during crowd-control events.

64.     With respect to mutual aid/assistance from other jurisdictions, the OIM report found that officers from other jurisdictions had used the following types of weapons and ammunition against protesters:  (1) at least 73 rounds of rubber-ball projectiles/pellets; (2) more than 150 "less-lethal" shotgun rounds, which can be aimed and fired like traditional shotguns and which can also be mistakenly loaded with and fire lethal ammunition; and (3) more than 200 rounds of "beanbags" filled with lead shot. According to the report, the Use of Force Policy and Crowd Management Manual of the DPD did not address the use of such weapons and ammunition one way or the other.

65.     The OIM report not only recommended that the DPD develop agreements, procedures, and command control structures for working with other jurisdictions, but also that the DPD require its mutual aid partners to adhere to DPD's policies and use only the weapons and ammunition approved by the DPD.

66.     The OIM report also found problems with internal tracking and logging of the use of less-lethal weapons during crowd control events; insufficient requirements and policies regarding the wearing and use of body cameras during such events; insufficient supervision and review of officers and corresponding use of force during crowd control operations; failure of officers and supervisors to issue dispersal orders before using force to disperse crowds; lack of sufficient enforcement regarding the prominent display of officers' badge numbers; and allowing untrained or insufficiently trained officers to use "less-lethal" weapons, including pepper ball

launchers and other projectile weapons, during crowd control operations.

67.     The OIM report also found that there was no guidance for high-risk explosive devices, such as rubber-ball grenades and noise-flash diversionary devices ("NFDDs"), and it identified inappropriate and/or insufficient standards for the use of "direct-fired" impact projectiles and pepper balls.  Specifically, the report found that the DPD has only one standard for using such direct-fired impact projectiles—defensive resistance—which is defined in the crowd control context as "physical actions by members of a crowd that constitute an unlawful assembly and/or disruption to pedestrian or vehicle traffic."  The report continued, "This means that an officer may strike a person directly with pepper ball in response to nothing more than disrupting traffic.  We believe that this standard is too low for direct-fired pepper ball use.  We believe that striking someone directly with an impact projectile that could cause them serious harm during crowd control should be reserved for situations in which individuals are engaging in no less than active aggression, defined as 'an overt act or threat of an assault, coupled with the present ability to carry out the action, which reasonably indicates that an assault or injury to a person is likely.'"

68.     In light of these findings, the OIM report made the following recommendations: that the DPD disallow the use of rubber-ball grenades during crowd control operations; that the DPD articulate clear and specific standards for when rubber-ball grenades and NFDDs may be used; that the DPD revise its standards for pepper ball use; and that direct-fired applications of pepper balls be limited only to circumstances in which a person displays active or aggravated active aggression.

69.     The OIM report highlighted the facially unconstitutional written policy allowing excessive force to be used on protesters such as Plaintiffs.

70.     Specifically, the DPD Use of Force Policy explicitly states that these weapons can cause serious bodily injury or death and can only be used to prevent a subject/targeted person from physically harming officers, other civilians, or themselves.

71.      However, the DPD Crowd Control Manual simultaneously allows officers to use the same less lethal weapons against members of a crowd that constitutes an unlawful assembly and/or causes disruption to pedestrian or vehicle traffic.

72.     Shooting peaceful protesters with rubber bullets because they have disrupted traffic is grossly disproportionate force and is unconstitutional.

73.     Thus, the City's use of force policy as written unconstitutionally permits officers to use grossly disproportionate force against crowds, including protesters such as Plaintiffs, for nothing more than standing in the street during a protest.

74.     This policy, in itself, is certain to result in serious injuries to non-violent protesters, as it did to both Plaintiffs. When the policy is coupled with the known custom and ratification of excessive force, the known custom and ratification of failing to issue dispersal orders, and the known custom and ratification of targeting particularly sensitive areas of the body, the City's deliberate indifference to the violation of citizens' constitutional rights is clear.

75.     The deficient policies in effect at the time of the protests in May and June of 2020, are found in the Force Related Polices of section 105 of the DPD Operations Manual (revised Jan. 27, 2019) and the DPD Crowd Management Manual (revised Feb. 13, 2019), and they are further identified and discussed in the OIM report, which is attached hereto and is incorporated by reference herein as **Exhibit 2**.

76.     Furthermore, the City failed to properly train its officers and agents on the

constitutional limits of the use of force, specifically including the use of less lethal munitions during crowd control operations.

77.     The City's insufficient training on these matters is exhibited by the fact that an officer, who had just recently completed the City's officer training program, thought it appropriate to publicly post on Instagram the admonition, "Let's start a riot," as the protests began.

78.     Furthermore, at least two other DPD police officers, Officer Diego Archuleta and Officer Derek Street (both of whom are named defendants in another federal lawsuit that involves the shooting of Jax Feldmann directly in his eye with a pepper ball on May 30, 2020), were disciplined in two different incidents that occurred during the initial days of the protests in which they used chemicals or direct-fired impact projectiles against protesters or other people who were fleeing, trying to comply with commands, or expressing their contempt for police. Both officers were disciplined, at least in part, for failure to distinguish between individuals participating in illegal activity and those merely verbalizing or expressing discontent with police.

79.     Officer Archuleta, who had been with the DPD for four (4) years as of May 2020, had only received one (1) hour of crowd control training during his time at the Academy.

80.     The DPD's failure to properly train and supervise its officers and agents on the constitutional limits of using less lethal munitions, including rubber bullets, its implementation of inappropriate or insufficient policies, its failure to implement new or revised policies, standards, and guidance for its officers relating to the use of less lethal munitions during crowd control events, its failure to implement any limitations on use of force with regard to outside law enforcement agencies, and its failure to correct DPD customs as set forth in the OIM report resulted in the officers' inappropriate and widespread direct-fire use of less lethal munitions, including rubber

bullets, against protesters. Such inappropriate direct-fire use, including aiming and firing hard projectiles at people's heads, faces, and groin areas, was the cause of many serious injuries, including the permanent and disfiguring injuries to Plaintiffs' faces/eyes.

81.     The policy, practice, custom, and/or lack of training that has led to the DPD's use of unnecessary and excessive force pre-existed the incident involving the Plaintiffs and has been in place at the DPD for many years. This policy, practice, custom, and/or lack of training applies to the unconstitutional treatment of individuals by DPD officers, as well as unconstitutional treatment of groups of protestors.

82.     In October 2011, DPD officers used "less lethal" munitions, including tear gas and pepper balls, against protesters involved in the "Occupy" demonstrations. At least one civilian was struck in the face. Despite recommendations of the OIM that the DPD employ its Tactics Review Board ("TRB") to assess the tactics used during the clash with demonstrators, including compliance with existing policies and procedures, and the need for any revisions to such policies and procedures, related training, and recommendations for crowd control tactics to improve outcomes for future demonstrations, the City declined to accept those recommendations.

83.     In January 2017, the OIM again highlighted several noteworthy deficiencies in the DPD's draft Use of Force Policy, including vague and poorly defined key provisions, lack of clarity for the overall standard for when force may be used, less restrictive standards for use of force as compared to other similar large police agencies in the country, and lack of adherence to national standards, including the definition of deadly force.

84.     There are dozens of additional documented claims and lawsuits against the City and/or its police officers going back well over ten years in which the City either paid settlements

or had verdicts against it based on allegations of the use of unnecessary and excessive force against individuals in non-violent situations.  Recently, Attorney David Lane compiled a list of just some of those incidents as an exhibit to a Complaint against the City captioned *Naphtali et al. v. City and County of Denver,* Case No. 1:20-cv-02198.  A version of Mr. Lane's exhibit is attached hereto and incorporated by reference herein as **Exhibit 3**.

85.     If the City had clear policies and guidelines about the proper handling of peaceful demonstrations, crowd control, the proper and safe use of less-lethal projectiles and munitions, and the protection of constitutional rights, then the Denver police officers, specifically including the Defendant Officers, would have known that they could not fire hard projectiles indiscriminately into a gathering of people, aim and shoot such projectiles at specific individuals' heads and faces, continue to use such munitions after a crowd or group had dispersed, and, in any event, that they could not use any type of force, whether lethal or less-lethal, against any persons, such as Plaintiffs, who were unarmed, unthreatening, not disobeying commands, and not committing any violent or potentially dangerous offense.

86.     Defendant Officers' unconstitutional conduct of shooting rubber bullets or other hard projectiles at the Plaintiffs' respective heads, faces, and eyes was taken pursuant to the unconstitutional customs, policies, procedures, and lack of sufficient training and supervision by the City and the DPD.

### C.     Plaintiff's Damages

87.     The Defendant Officers purposefully aimed and fired their weapons at Plaintiffs' respective heads, faces, and eyes.

88.     As a direct and proximate result of the Defendant Officers' intentional, arbitrary,

excessive, and wholly unnecessary actions and the City's policies, practices, customs, and/or lack of supervision and training, which were the moving force and cause of the Defendant Officers' misconduct, Plaintiffs Orlin and Murphy suffered injuries, damages, and losses, including without limitation partial blindness and/or diminished vision in their left eyes, permanent scarring and/or disfigurement of their faces, permanent impairment from their partial vision loss and/or diminished vision, loss of income in the past and future, loss of economic opportunity, loss of enjoyment of life, great physical and mental pain and suffering, and fear of exercising their First Amendment Constitutional rights to peacefully assemble, peacefully associate, and peacefully express their opinions and beliefs, particularly their opinions and beliefs about racial injustice and police brutality.

**CLAIMS FOR RELIEF**
**CLAIMS UNDER FEDERAL LAW, 42 U.S.C. §1983**

89.     Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

90.     The First Amendment of the United States Constitution protects the freedom of speech, association, expression, press, and the right of people to peacefully assemble and petition the Government to redress grievances.

91.     The Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures and the use of excessive force in connection therewith. When restraining, detaining, and/or arresting a person, the Fourth Amendment protections only allow police officers to use the amount of force that is reasonable and necessary under the circumstances.

92.     The Fourteenth Amendment protects persons from deprivations of life (including loss of or injury to life), liberty, and property without due process of law, including substantive

protections against arbitrary abuses of executive power.

93.     A municipality may be liable under 42 U.S.C. §1983 where a municipal policy or custom causes the constitutional violations, and the municipality's failure to adequately train its officers may form the basis of such municipal policy or custom.  *See City of Canton, Ohio v. Harris*, 489 U.S.  378, 388-90 (1989).

94.     The City, through its Mayor, the Chief of Police, and its Manager of Public Safety had the ultimate decision- and policy-making power for the DPD and ultimate responsibility for adopting and implementing DPD policies and imparting such policies to DPD's police officers and agents acting on its behalf through training and supervision.

## FIRST CLAIM FOR RELIEF
### 42 U.S.C. §1983 – Violation of Fourth Amendment of U.S. Constitution
### Use of Unnecessary, Unreasonable and Excessive Force
### (Plaintiffs against the Defendant Officers)

95.     Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

96.     At all relevant times, the Defendants acted under color of state law, and the Defendant Officers acted within the course and scope of their employment and/or agency as law enforcement officers for the City.

97.     Plaintiffs had protected Fourth Amendment interests against being injured and victimized by the use of excessive force by law enforcement officers, specifically including the Defendant Officers.

98.     A "seizure" for purposes of the Fourth Amendment to the U.S. Constitution occurs when an officer intentionally applies physical force to the body of person or show of authority to restrain his or her freedom to simply walk away.  *See, e.g., Torres v. Madrid*, 141 S.Ct. 989, 993

(2021); *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *Fogarty v. Gallegos*, 523 F.3d 1147, 1155 (10th Cir. 2008). Furthermore, the high-level use of force of an officer pointing a gun at a person constitutes a seizure as a matter law. *See Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018). Even an unintended person is "seized" if he or she is an object of the detention. *Browar v. County of Inyo*, 489 U.S. 593, 596 (1989).

99.     Whether the force used by police officers is unreasonable and thus excessive is determined by an objective analysis of the facts and circumstances that existed at the time the force was applied, including the severity of the suspected crime, whether an immediate threat was posed to the safety of the officers and others, and whether the suspect was actively resisting or evading arrest. *Fogarty*, 523 F.3d at 1159-60.

100.     Reasonable officers at the time of the actions alleged herein would have been on notice that using less lethal munitions (such as KIPs, rubber bullets, and pepper balls) or "any other type of pain-inflicting compliance technique" may constitute excessive force if applied under circumstances that failed to warrant such use of force. *Fogarty*, 523 F.3d at 1161-62.

101.     The Defendant Officers seized the Plaintiffs by purposefully aiming their weapons at Plaintiffs' respective heads and faces and shooting them in their respective eyes, which stopped Plaintiffs and restricted their freedom of movement as previously alleged.

102.     Such actions by the Defendant Officers objectively manifested an intention to stop and restrain the Plaintiffs.

103.     The Defendant Officers had no warrants authorizing the seizure of Plaintiffs.

104.     Each of the Defendant Officers failed to intervene to prevent the other Defendant Officers from violating Plaintiffs' constitutional rights.

105.    The actions of the Defendant Officers were objectively unreasonable in light of the circumstances surrounding each Plaintiff because Plaintiffs had not committed any crime, nor was there any basis on which the Defendant Officers could have reasonably believed that Plaintiffs had committed any crime.

106.    Plaintiffs were not armed, resisting arrest, fleeing, or threatening the Defendant Officers or any other officers or persons.

107.    Thus, the Defendant Officers had no legal justification to seize Plaintiffs in the manner and with the level of force used under the circumstances presented.

108.    The Defendant Officers recklessly created the situation in which they used force. They had sufficient time and opportunity to assess the situation and surrounding circumstances but failed to do so.  Instead, they simply aimed and fired at Plaintiffs' respective heads and eyes without any warnings, commands, reason, or provocation, thereby causing severe injury, vision loss, physical impairment, and physical disfigurement to both Plaintiffs.

109.    No use of force, much less shooting dangerous injury-producing projectiles at particularly sensitive body parts (heads, faces, and eyes), was warranted against the Plaintiffs under the circumstances that existed at the time.  Accordingly, shooting the Plaintiffs in their respective heads, faces, and eyes with hard projectiles was patently and objectively unreasonable.

110.    The Defendant Officers' use of excessive, unreasonable, and unnecessary force to seize Plaintiffs under the circumstances violated clearly established law and rights protected by the United States Constitution.

111.    The Defendant Officers engaged in these actions intentionally, willfully, and wantonly, and demonstrated deliberate indifference to and reckless disregard for Plaintiffs'

constitutionally protected rights.

112.    As a direct and proximate result of the Defendant Officers' unconstitutional acts and omissions, Plaintiffs' constitutional rights were violated, and they suffered injuries, damages, and losses as previously alleged above.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. §1983 - Violation of Fourteenth Amendment of U.S. Constitution**
**Unnecessary, Unreasonable & Excessive Force**
**(Plaintiffs against the Defendant Officers)**

113.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

114.    Plaintiffs had protected Fourteenth Amendment Substantive Due Process rights and interests against being unreasonably, arbitrarily, and intentionally harmed by the use of unnecessary and/or excessive force by law enforcement officers, specifically including the Defendant Officers.

115.    The Defendant Officers deprived Plaintiffs of their Fourteenth Amendment substantive due process rights by purposefully firing hard projectiles at Plaintiffs' respective heads, faces, and eyes without any warnings, commands, reason, or provocation, thereby causing severe injury, vision loss, physical impairment, and physical disfigurement to both Plaintiffs.

116.    Because the Plaintiffs were not committing any crime, fleeing, or otherwise threatening anyone, the Defendant Officers had sufficient time for deliberation before choosing to aim and shoot at the Plaintiffs' respective head, faces, and eyes.

117.    The Defendant Officers aimed their weapons, loaded with hard projectiles, directly at Plaintiffs' respective heads and faces—not at parts of their bodies that would be less likely to cause serious or disfiguring injuries or, even more prudently, at an area of the ground a safe

26

distance from their bodies—with the intention of causing, or with deliberate indifference to the possibility that doing so would likely cause, serious bodily harm and injury to Plaintiffs.

118.    The Defendant Officers' actions were not only intentional, but also arbitrary and malicious under the circumstances given that they aimed and shot directly at Plaintiffs despite the fact that neither of them had committed any crime, nor were they armed, rioting, or threatening any persons.

119.    The Defendant Officers acted maliciously and/or with excessive zeal that amounted to an abuse of power, and they acted for the purpose of causing the Plaintiffs harm that was unrelated and unnecessary to any legitimate policing objective.

120.    Each of the Defendant Officers failed to intervene to prevent the others from violating Plaintiffs' constitutional rights.

121.    Such callous and arbitrary actions by the Defendant Officers, who are supposed to be charged with serving and protecting members of the public—not arbitrarily shooting at them—represent conscious-shocking, indecent, intentional, and/or deliberately indifferent conduct directed at Plaintiffs in violation of their right to life, the enjoyment of it, and liberty protected under the U.S. Constitution.

122.    As a direct and proximate result of the Defendant Officers' unconstitutional acts and omissions, Plaintiffs' constitutional rights were violated, and they suffered permanent and disfiguring injuries, permanent impairment, and other damages and losses as previously alleged above.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. §1983 - Violation of the First Amendment of the U.S. Constitution**
**Unreasonable Suppression of Free Speech, Assembly and/or Association**
**(Plaintiffs against the Defendant Officers)**

123.    Plaintiffs incorporate by reference herein all preceding allegations set forth in this Complaint.

124.    Plaintiffs had protected First Amendment rights to express their viewpoints and support by attending peaceful protests to redress grievances against police misconduct, to assemble and associate with other peaceful protesters, and/or to record and document such public protests and the public response by the police to such protests.

125.    As previously alleged, Plaintiffs were in the area where peaceful protests were occurring at the time they were shot in their respective heads/eyes with hard projectiles by the Defendant Officers.  Plaintiff Orlin was shot by one of the Defendant Officers while trying to cover a tear gas canister to reduce the amount of noxious chemicals that already filled air, and Plaintiff Murphy was shot by one of the Defendant Officers while simply standing alone and observing.

126.    As previously alleged, there was no reason or justification for using any force against Plaintiffs at the time the Defendant Officers shot them in their respective heads/eyes with rubber bullets or other similar hard projectiles.

127.    The Defendant Officers violated the Plaintiffs' First Amendment rights by targeting and shooting them in their respective heads/eyes to suppress, punish, and/or retaliate against Plaintiffs for peacefully expressing themselves and their viewpoints against police misconduct and brutality, documenting or recording the protests, and/or being associated with those who were out protesting against police misconduct and brutality.

128.    As a direct and proximate result of the Defendant Officers' unconstitutional acts

and omissions, Plaintiffs' constitutional rights were violated, and they suffered permanent and disfiguring injuries, permanent impairment, and other damages and losses as previously alleged above.

### FOURTH CLAIM FOR RELIEF
**Unconstitutional Policies, Customs, and Practices, Failure to Train, and Ratification Resulting in Violations of Plaintiffs' Constitutional Rights**
**(Plaintiffs against the City)**

129.    Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

130.    As previously alleged, the Defendant Officers aimed and shot rubber bullets, KIPs, or other similar hard projectile at Plaintiffs respective heads, faces, and eyes for no justifiable reasons, thereby violating Plaintiffs' constitutional rights under the Fourth, Fourteenth, and/or First Amendments to the U.S. Constitution.

131.    The DPD has a long-standing custom of using grossly disproportionate force against peaceful protesters, going back to at least 2011, and continuing well past the George Floyd protests of May and June 2020. The City has taken no action to curtail or rectify this unconstitutional custom, and City leaders have ratified and even praised the DPD for these customs.

132.    The Defendant City has a policy, practice, and/or custom of tolerating violations of constitutional rights by its police officers, which prompted the Defendant Officers to engage in such actions that targeted protesters, and which allowed and/or prompted Defendant Officers to use excessive and completely unnecessary and unjustified force against Plaintiffs.

133.    The City's written policies are facially unconstitutional. The City failed to adopt, revise, implement, enforce, and/or properly train its officers, including the Defendant Officers, on

policies and practices that delineate the constitutional limitations of force, the circumstances under which force should be used, the type of weapons that are appropriate under the circumstances, including the use of less-lethal weapons, and how such weapons should be used to prevent or minimize unnecessary harm and constitutional violations to the citizenry, especially in the context of protests and crowd control.

134.    The City further failed to properly train its officers, including the Defendant Officers, on distinguishing illegal or threatening behavior from merely demonstrative behavior expressing discontent with the police or other persons or groups.

135.    Based on earlier protest movements, such as the "Occupy" protests, a long history of claims and complaints of excessive and inappropriate force by its officers, and the policy deficiencies identified by the OIM, the City was aware that such constitutional violations would be certain, yet still failed to adopt proper policies and/or provide proper training on the constitutional limitations of targeting individuals and using force against them to suppress protected First Amendment expression and activities.

136.    The City's unconstitutional policies, practices, customs, and/or training failures in connection with First Amendment protections were further exemplified and ratified by its issuance of a curfew that provided no exceptions for activities protected by the First Amendment.

137.    Accordingly, the City adopted an official policy of targeting protesters (and those perceived to be or associated with protesters) during the curfew hours, while not targeting non-protesters (or those who appeared not to be protesting).  This was intended to further suppress protected First Amendment activities, including the right to free speech, expression, association, and assembly, and it violated the First Amendment.

138.    The City further failed to provide any training or guidance to its police officers about how to properly enforce curfews, such as not randomly shooting or attacking people simply because they were outside after curfew hours, recognizing and distinguishing peaceful protected speech and expression as opposed to non-peaceful and violent rioting, first stopping and questioning people about why they were out after curfew, and then issuing appropriate citations rather than assuming a violation and using injurious force against them.

139.    The City, through its policymakers, further ratified the constitutional violations against Plaintiffs by publicly praising the actions of its officers and agents and their handling of the protests despite the City's knowledge that its officers were already using excessive force against protesters, by allowing its officers to continue engaging in such unconstitutional conduct despite internal recommendations to the contrary and despite a federal court order enjoining such conduct, and by failing to prosecute or otherwise properly discipline any officers who committed similar violations.

140.    The City's policies, practices, customs, failure to train, failure to discipline, and ratification by its final policymakers, were the moving force behind the Defendant Officers' misconduct and thus the cause of the violation of Plaintiffs' constitutional rights.

141.    As shown by OIM evaluations and recommendations in the aftermath of the 2020 protests, OIM evaluations and recommendations that followed earlier demonstrations, and other examples of police misconduct by officers of the DPD over the past decade and beyond, the need for proper policies, practices, training and supervision of officers on the constitutional limits of force, including how to properly handle non-violent citizens and protesters, demonstrations, curfews, and crowd control, was so obvious and lacking and so likely to result in the violation of

constitutional rights, that the City was deliberately indifferent to the need.

142.     As a direct and proximate result of the City's unconstitutional policies, practices, customs, failure to properly train and supervise its officers, and its acts and omissions in relation thereto, the Defendant Officers believed they could target protesters, specifically including the Plaintiffs, by using less lethal weapons against them in ways that were certain to cause pain and inflict serious injuries

143.     Consistent with the City's unconstitutional policies, practices, customs, and failure to properly train and supervise its police officers, Defendant Officers targeted Plaintiffs and shot them in the faces and eyes with rubber bullets or other similar hard projectiles simply because they were protesting; and as a result, both Plaintiffs suffered permanent and disfiguring injuries, permanent impairment, and other damages and losses as previously alleged above.

### REQUEST FOR PUNITIVE DAMAGES UNDER FEDERAL LAW
### (Against the Defendant Officers)

144.     Federal courts have held that punitive damages are available in actions for constitutional violations under §1983 where a defendant's conduct is shown to be motivated by evil motive or intent, or when the conduct involves reckless or callous indifference to the federally protected rights of others. *Smith v. Wade*, 461 U.S. 30, 56 (1983); *Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1308 (10th Cir. 2003).

145.     The Defendant Officers purposefully and intentionally aimed and fired their weapons at Plaintiffs' respective heads, faces, and eyes.  The circumstances, as previously alleged, indicate that they intended to hit and injure Plaintiffs, or at least that they acted with reckless or callous indifference to Plaintiffs' constitutional rights.

146.    Plaintiffs accordingly request an award of punitive damages against the Defendant Officers as allowed under federal law.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, Nicolas Orlin and Shawn Murphy, respectfully request that this Court enter judgment in their favor and against the Defendants, jointly and/or severally, as follows:

a.   General and compensatory damages in an amount that will fully and fairly compensate Plaintiffs for their respective injuries, damages, losses, and violation of their federal constitutional rights available pursuant to 42 U.S.C. §1983 and any other applicable federal law;

b.   Punitive damages against the Defendant Officers responsible for Plaintiffs' injuries pursuant to federal law as punishment and deterrence against the commission of future such conduct;

c.   Pre- and post-judgment interest;

d.   Reasonable attorneys' fees, expert witness fees, and the cost of this action, pursuant to 42 U.S.C. §1988 and any other applicable federal law; and

e.   Any other relief the Court deems proper and just.

**PLAINTIFFS DEMAND TRIAL TO A JURY ON ALL ISSUES SO TRIABLE**

Dated this 27th day of January, 2022.

Respectfully submitted,
BEEM & ISLEY, P.C.

 s/Clifford L. Beem
Clifford L. Beem
A. Mark Isley
Danielle C. Beem
730 - 17th Street, Suite 850
Denver, Colorado  80202
Ph:     303.894.8100
Fax:    303.894.8200
clbeem@beemlaw.net
amisley@beemlaw.net
dcbeem@beemlaw.net


BAUMGARTNER LAW, L.L.C.

 s/ S. Birk Baumgartner
S. Birk Baumgartner
Sean M. Simeson
Adam R. Yoast
300 E. Hampden Ave., Ste. 401
Englewood, CO 80113
Phone: (303) 529-3476
Fax: (720) 634.1018
birk@baumgartnerlaw.com
sean@baumgartnerlaw.com
adam@baumgartnerlaw.com

*Counsel for Plaintiffs*

Plaintiffs' Addresses:
c/o Baumgartner Law, LLC
300 E. Hampden Ave., Suite 401
Englewood, CO 80113